## The Sayre Land Co. v. Pennsylvania Public Utility Commission

*Jefferson C. Barnhart, Harry H. Frank,* of *McNees, Wallace & Nurick,* for plaintiff.

*T. Edwards Munce, Jack F. Aschinger* and *Thomas M. Kerrigan,* for the Public Utility Commission.

*W. Russell Hoerner, Frank A. Sinon,* of *Rhoads, Sinon & Reader,* for amicus curiae.

SOHN, J., March 9, 1959.—The fundamental question in this case, under the stipulated facts and other additional facts as we have found them from the record, is whether plaintiff, The Sayre Land Company, is a public utility subject to the Pennsylvania Public Utility Commission's regulatory functions. A brief history of prior proceedings is now in order.

## History

By "Complaint in Equity For a Final Injunction," dated June 24, 1954, The Sayre Land Company, a corporation of, and doing business in, the Commonwealth of Pennsylvania, hereinafter referred to as "plaintiff" or the "land company," filed this complaint, seeking a permanent injunction to compel the Pennsylvania Public Utility Commission, hereinafter referred to as the "commission," to forthwith dismiss and discontinue all proceedings pending before it in complaints entitled Borough of Sayre v. The Sayre Land Company, docketed at C. 15700, and Borough of Athens v. The Sayre Land Company, docketed at C. 15701, and in an investigation upon commission motion entitled Pa. P. U. C. v. The Sayre Land Company, docketed at C. 13907-43. The answer of the Pennsylvania Public Utility Commission is dated July 19, 1954. A reply, dated August 11, 1954, was filed by the land company.

Borough of Athens and Borough of Sayre petitioned this court to intervene as additional party defendants. The land company filed an answer and brief in opposition thereto. On September 7, 1954, after hearing, this court denied the petition of Borough of Athens and the petition of Borough of Sayre. Petitioners, however, were granted the right to enter their appearance therein as amicus curiae.

A hearing was held on April 26, 1955. Seventy-two pages of testimony were taken. The land company identified four numbered exhibits and the commission

identified four numbered exhibits. All exhibits were accepted for the record. . . .

## Discussion

In approaching the problem which confronts us in this case, we must first look to the Public Utility Law and its various provisions. Section 2(17) of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1102(17), defines the term "public utility" as follows:

"(17) 'Public Utility' means persons or corporations now or hereafter owning or operating in this Commonwealth equipment, or facilities for: . . .

"(b) Diverting, developing, pumping, impounding, distributing, or furnishing water to or for the public for compensation; . . ."

It thus appears from this definition that the tests as to whether a utility is a "public utility" are *ownership* or *operation* of certain described facilities. We must consider in the instant case that the type of facilities, ownership or operation of which create a public utility status, is described in the phrase, "diverting . . . or furnishing water to or for the public for compensation."

In section 2(10) of the Public Utility Law, 66 PS §1102(10), "facilities" is defined as follows:

"(10) 'Facilities' means all the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished, or supplied for, by, or in connection with, the business of any public utility: . . ."

For the purpose of this case, the term "facilities" means plant and equipment.

The question for us to determine is whether The Sayre Land Company either owns or operates facilities of the above described type. If it does, then by

this legislative definition, it is a public utility and subject to all incidents flowing from its status as such. From the stipulated facts, and the additional facts as we find them, it clearly appears that The Sayre Land Company owns the bulk of the facilities used in furnishing water service to the public in the Borough of Sayre and the Borough of Athens and their vicinity. The Sayre Land Company owns the mains, hydrants, reservoirs, buildings, pumps, sedimentation basins and the pumps which are necessary to drive the water through the mains, and other various items as stipulated. It is further stipulated that 80 percent to 90 percent of the original cost of the facilities are owned by The Sayre Land Company. With these facts in mind, as well as the legislature's definition of a public utility, the conclusion is inescapable that The Sayre Land Company owns facilities for furnishing water service. The conclusion is inescapable, therefore, that The Sayre Land Company is a public utility.

Now, how does The Sayre Water Company operate? We believe, and so find in this case, that The Sayre Water Company is acting as the agent of The Sayre Land Company. The rule of law is that whenever parties by express words or tacit conduct indicate that one acts on behalf of the other, an agency is created. See Brock v. Real Estate-Land Title and Trust Company, 318 Pa. 49, 178 Atl. 146; Restatement of Agency 2d §1.

We cannot find here that The Sayre Water Company functions as a free-standing, independent party, but that it does operate under the control of and as an agent of The Sayre Land Company. The facts in the case clearly indicate this. Although our conclusions are not based merely upon the fact that there are certain officers and directors who are common to both corporations, that fact must be taken into consideration for from it we may conclude that they are evi-

dence of control, which is an incident of the principal-agent relationship which we have just discussed.

We believe that the most impelling fact in this case is the agreement between the two companies concerned here, which was executed as a modification of the original contract in 1896. Although the water company operates the waterworks facilities and collects the revenues from its customers, no matter how efficient its management may be so that expenses are kept to a bare minimum, there can be no real benefit to The Sayre Water Company, for all of its net earnings in excess of $300 per year must be returned to The Sayre Land Company as a "lease rental." If the gross operating revenues of the water company are increased through changes in rates filed with the Public Utility Commission, or if it has an increase in the number of its customers, there is still no benefit to The Sayre Water Company for the same reason. If the rate base is increased by capital investment in mains and other property additions which are paid for by the land company, nevertheless again the only corporation which benefits is The Sayre Land Company. It appears from the record that where the "lease rental" is below an acceptable percentage rate of return to The Sayre Land Company on its capital investment in its waterworks facilities, The Sayre Water Company then files increased rates with the Public Utility Commission, and as a consequence, the net earnings of The Sayre Water Company are increased. But again The Sayre Land Company gets these increased earnings as leased rental payment, for as we have heretofore pointed out, under the terms of the 1896 agreement, The Sayre Water Company may keep only $300 per year for itself. Today The Sayre Water Company, under the so-called "lease," remains the same as it did when originally incorporated. The dividends on its capital stock cannot increase, for its

retained net earnings cannot increase. Nor can its capital grow for it is forbidden to issue more capital stock.

The facts produced in this case do not show up the water company as a corporation operating in its own interest and for that of its stockholders. The water company exists only to serve the interests of The Sayre Land Company and all of The Sayre Water Company's acts and its agreement are directed to that end. The Sayre Water Company in the operation of the waterworks facilities is indeed the agent of The Sayre Land Company, and The Sayre Water Company has no corporate objective of its own. In short, if we may properly identify these two companies, we would say that The Sayre Land Company is in the capacity of an Edgar Bergen operating The Sayre Water Company as its own "Charlie McCarthy." We must come to the conclusion that The Sayre Land Company is a public utility.

Plaintiff has set forth many contentions why it should not be held to be a public utility. One of the first is that there has been an unlawful delegation of legislative power. But an examination of section 2 (17), 66 PS §1102 (17), discloses an act of the legislature itself defining the term "public utility." There is no unlawful delegation of power to the Public Utility Commission for the authority is in the very Public Utility Law itself. In this law the legislature has given the Public Utility Commission jurisdiction over public utilities. In that same law, the legislature has defined the term as including *owners and operators of facilities*. When the testimony discloses that a person or a corporation is an owner or an operator of a facility, then jurisdiction attaches. The legislature has defined the term "public utility." We need only refer to Locke's Appeal, 72 Pa. 491, 498, where it was held, and followed in a long line of cases, that:

". . . The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend."

It is the function of the Public Utility Commission to determine the existence of the fact of ownership or operation of public utility facilities.

Plaintiff in effect advances the argument that because the commission is attempting to have The Sayre Land Company declared to be a public utility that therefore it should exercise jurisdiction over all owners of property used and useful in public service. Mere ownership alone has not in the past been considered by the Public Utility Commission as a reason in all cases for exercising its complete jurisdiction. We know of no action of the Public Utility Commission where it has ever promulgated a rule setting forth the circumstances under which it would exercise fully its jurisdiction over "owners" of public utility property. It cannot be argued successfully under the facts established in this case that there is a denial of equal protection of the laws if the Public Utility Commission does not attempt to exercise to the full its jurisdiction over owners of all public utility property. Here we have found that The Sayre Land Company owns the predominant part of the property used in rendering public utility service, that it dominates and controls the so-called "lessee", that this public utility is operated only for the benefit of the lessor and that the lessee itself has nothing to look forward to in the future except its bare corporate existence.

Among the many cases submitted by plaintiff for our consideration is the case of the Pennsylvania Public Utility Commission v. Equitable Gas Co., 25 Pa. P.U.C. 258. However, we do not believe that this case is authority for the proposition advanced by plaintiff.

In that case the situation was not a permanent one. It appears that the Philadelphia Company for many years had been under an order of the Securities and Exchange Commission directing the Philadelphia Company to divest itself of all control over the Equitable Gas Company and other operating public utilities. As a result of said order, today the Equitable Gas Company is an independent, operating public utility owned by the investing public, and its shares are listed on the New York Stock Exchange. The Equitable Gas Company itself now owns substantially all the property used by it in the operation of its business.

Many and varied cases have been submitted us by plaintiff for our consideration, bearing on the proposition that plaintiff, under the facts developed in the instant case, is not a public utility. To follow plaintiff's reasoning, we must overlook the significance of the change in approach by the legislature between The Public Service Company Law and the Public Utility Law. The former act was the Act of July 26, 1913, P. L. 1374, while the latter act is the Act of May 28, 1937, P. L. 1053. Clearly the latter act was passed to take the place of the former act. There is a vast difference in the definition of the term "public utility" in the two acts.

In The Public Service Company Law, the legislature defined the term by stating in section 1 that certain types of corporations, or persons engaged in certain types of businesses, were public service companies. The term was defined to include "water corporations." "Owners" of public utility property were not included within the definition of the term "public service company," as found in The Public Service Company Law.

In the Public Utility Law, however, the legislature broadened the definition to include not only corpora-

tions or persons engaged in certain types of activities as "operators," but also corporations or persons owning facilities designated as used for certain purposes. Certainly the legislature intended to accomplish some legitimate objective in broadening the definition of the term "public utility". An examination of the cases cited before the passage of the Public Utility Law will clearly demonstrate that there was a vacuum or a hiatus so far as regulatory power existed under the former law so far as "owners" of property were concerned. When the legislature passed the Public Utility Law, the gap in the law was filled.

Plaintiff has urged upon this court that to afford recognition of the commission's jurisdiction over it as a "public utility" would lead to very serious results and consequences. It says that there will be an impairment of contract, that there will be undue interference with management, that there will be a need for corporate reorganization and other matters. We cannot so agree. As we see it, the only result will be that the two companies, one having ownership and the other operation, will be joined together *so far as regulatory control is concerned*, to make the two one whole public utility enterprise. Nor can we assume that the commission will act in an improper or unlawful manner. The existing contract between the two companies will not in fact be impaired. In its definition of the term "public utility", the legislature did not say that the status of a corporation is determined by the act under which it is formed. It is rather the nature of the corporation's activities and the nature of owned property which determines the corporation's status as a public utility, instead of the provisions of the corporation's charter. See City Transfer Company v. Public Service Commission, 93 Pa. Superior Ct. 210, and as stated in Pa. Chatauqua v. Public Service Commission, 105 Pa. Superior Ct. 160, 164, 160 Atl. 225,

which case we find in its facts to be very similar to the instant case: "A company which is in fact rendering service as a public utility cannot escape regulation on the ground that it has no charter right to render such service." A company which is defined by the legislature itself to be a public utility cannot point to the provisions of its charter to defeat that definition.

As pointed out to us in the very helpful amicus curiae brief filed on behalf of the Borough of Sayre and the Borough of Athens, "the Commission's primary objectives—indeed, its very reason for existence —is to ensure adequate service to the public at reasonable rates. Its subsidiary functions of controlling accounting, of supervising financial structure, etc. are vital to accomplishment of the primary objectives.

"It is not enough for plaintiff to say that the Commission has jurisdiction over Sayre Water Company and therefore can fulfill all its objectives by exercising control over Sayre Water Company. Let us assume that extensions should be made to serve additional customers. It would be futile for the Commission, under section 401 of the Public Utility Law, 66 PS §1171, to direct Sayre Water Company to make the extensions, for Sayre Water Company can always plead its poverty because all earnings over and above $300 per year must be paid to Sayre Land Company under the 'lease' no matter how large or small these earnings may be. Also, as noted before, Sayre Water Company is prohibited by the 'lease' from raising capital. Sayre Land Company holds the corporate purse, and it alone has the right to loosen the corporate purse strings. Three hundred dollars buys mighty little pipe. It is equally futile for the Commission to direct Sayre Water Company to submit the original cost of facilities it operates as 'lessee', for Sayre Land Company's books and records have the underlying data, if any.

"It is not enough for plaintiff to say that Sayre Land Company will 'cooperate'. Regulation by the Commonwealth of Pennsylvania—through its legislative agent, the Pennsylvania Public Utility Commission—does not hang by a tenuous thread labeled 'cooperation'. Regulation to be effective must be grounded on the solid rock of requiring action as a matter of sovereign right through legitimate exercise of the police power. The sovereign power of the Commonwealth of Pennsylvania cannot stand, with hat in hand, before an owner of public utility property and obsequiously accept whatever compliance with its legitimate directives that owner sees fit to bestow in the name of 'cooperation'. The sovereign voice of the Commonwealth has spoken through its legislature to give the Public Utility Commission jurisdiction over 'owners' of public utility property.

"Regulation would be empty mockery if the Commission's jurisdiction is not sustained, for then the corporate device of creating corporate lessors of public utility property and empty corporate shells to operate that property would become common. Indeed, this is no spectre. The Commission would have no effective control over extensions, financing, accounting, etc. These are consequences the legislature must have considered when enlarging the definition of the term 'public utility' in the Public Utility Law.". . .

*Conclusions of Law*

1. The Sayre Land Company is the owner of substantial waterworks facilities used in furnishing water service to and for the public for compensation and consequently is within the meaning of the term "public utility" as defined in the Public Utility Law.

2. The Sayre Land Company is a public utility where it owns waterworks property used in furnishing water service to and for the public for compensation and where such property is operated by The Sayre

Water Company under circumstances such as to constitute them one integrated and single business enterprise.

3. The commission in the proceedings before it is exercising the police power of the Commonwealth under proper legislative sanction.

4. The bill in equity filed by plaintiff in this case must be dismissed.

### Decree Nisi

And now, March 9, 1959, it is ordered, adjudged and decreed that plaintiff's bill herein filed be dismissed and it is hereby dismissed at its own proper costs and charges. The prothonotary is directed to enter this decree nisi and notify the parties to this proceeding or their counsel forthwith. If no exceptions are filed within 20 days after the filing of this decree, it shall be entered as a final decree.